DKD ELECTRIC COMPANY, INC.,

        Plaintiff,

FEDERATED SERVICE INSURANCE
COMPANY,

        Plaintiff in Intervention,

v.                                     No. CIV 97-1026 BB/LFG

ALLIED TUBE AND CONDUIT,

        Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on several motions and cross-motions requesting, *inter alia*, summary judgment in whole or in part, limitation of the issues for trial, and the exclusion of affidavits filed in support of the motions for summary judgment (Docs. 164, 169, 171, 174, 176, 179, 181, 184, 186, 189, 192, 201, 205, 208, and 211). These motions were filed August 31, September 11, September 15, and September 18, 1998. The Court notes that several of Defendant's motions raise identical, or virtually identical, legal arguments. For ease of reference, this opinion addresses the legal arguments separately rather than the motions. Although the Court attempts to synthesize the discussion and apply the results reached to the various motions, the Court will put the burden on the parties, and particularly Defendant, to ensure that the entirety of every motion has been disposed of. The Court has considered the submissions of the parties and the relevant case law, and finds as discussed below.

### Standard for Summary Judgment

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.</u>, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." <u>Id.</u> On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." <u>Walker v. NationsBank of Florida</u>, 53 F.3d 1548, 1555 (11th Cir. 1995). In addition, a motion for partial summary judgment filed under Rule 56 may be used to limit the issues for trial and establish facts, even if no claim in the lawsuit is disposed of entirely. <u>Cook v. Rockwell Int'l Corp.</u>, ___ F.Supp. ___, 1998 WL 433867, fn.13, *16 (D.Colo. 1998). The Court will consider the various motions filed in this case in light of these standards.

### Brief Summary of the Facts

Plaintiff is an electrical contracting company and submitted a successful bid to install electrical conduit and cable at a plant owned by Intel. This job had to be performed within a strict timetable. Defendant manufactures conduit appropriate for the uses contemplated by Plaintiff, and advertises its conduit as meeting the requirements of Underwriters Laboratories (UL) specifications. For this particular job, Plaintiff purchased a type of conduit manufactured exclusively by Defendant, called Kwik-Fit conduit. The advertised advantages of Kwik-Fit include speed of installation, because the lengths of conduit come with coupling devices already attached, eliminating the necessity of installing separate coupling mechanisms. Plaintiff did not purchase the conduit directly from Defendant, but from a distributor. It appears Defendant does not sell any conduit directly to customers, preferring to dispense its product through a distributor system instead. The conduit was shipped directly to Plaintiff's work-site by Defendant, based on information supplied by the distributor in the purchase

order submitted to Defendant. Plaintiff purchased several thousand ten-foot lengths of conduit from the distributor and began installation.

When electrical cable was run through a portion of the conduit, the cable failed at least two tests. Upon removing and inspecting the cable, Plaintiff discovered it was frayed and cut in several places. Plaintiff then removed sections of the Kwik-Fit conduit and inspected them. These sections allegedly contained a number of imperfections, such as sharp protrusions and hardened globs of paint, which could have frayed and cut the cable. The imperfections were located inside the tube running through the center of the conduit. Intel and the general contractor immediately ordered Plaintiff to remove all of the Kwik-Fit conduit and replace it with satisfactory conduit. Intel also required Plaintiff to finish the job in a timely manner, despite the necessity of re-doing a substantial portion of the work. Removing and replacing the defective conduit, as well as finishing the rest of the job, was made more difficult because Plaintiff no longer had unfettered access to the work area. That is, instead of being the first subcontractor and working in an empty space, as Plaintiff had done originally, Plaintiff was forced to work around obstacles created by other subcontractors who had performed their own work in the meantime. To meet Intel's requirements, Plaintiff was forced to hire a number of extra workers and incur other expenses, such as overtime pay and other increased costs.

Plaintiff filed suit against Defendant, the cable manufacturing company, and the distributor of Defendant's conduit. Plaintiff's insurer, which had paid Plaintiff $500,000 to cover part of the cost of remedying the situation, joined in the lawsuit as a plaintiff in intervention (for ease of reference, this opinion will refer to both Plaintiff and its Insurer collectively as Plaintiff). Plaintiff has settled with the other defendants, leaving Allied Tube and Conduit as the sole defendant. Plaintiff maintains Defendant, as the manufacturer of the defective conduit, is liable for breach of implied warranties of merchantability and fitness for a particular purpose, breach of express warranties, and violation of the New Mexico Unfair Trade Practices Act. Plaintiff also maintains Defendant has committed several torts, including negligent misrepresentation and fraud. Other relevant facts are included in the discussions of the individual issues raised by the parties.

3

**Plaintiff's Duty to Inspect the Conduit**

Defendant argues Plaintiff had a duty to inspect the conduit before installing it, the imperfections in the conduit were readily visible, and Plaintiff's failure to inspect the conduit precludes Plaintiff from any recovery for breach of either implied or express warranties. Defendant contends Plaintiff's claims for breach of warranties are barred as a matter of law. Plaintiff, on the other hand, points out that the imperfections in the conduit segments were located inside a narrow ten-feet-long tube, that there were thousands of such segments to be installed, and that the defects in the conduit were not discovered until after cable had been pulled through portions of the conduit and tests performed. Plaintiff also points out that a buyer's duty to inspect applies only before a purchase has been made, and only if the seller requests the buyer to perform such an inspection. Plaintiff requests a determination that it had no duty to inspect the conduit prior to installing it.

Defendant's position regarding inspection is without merit. The very statute relied on by Defendant, NMSA 1978, Section 55-2-316(3)(b), applies only when the buyer "before entering into the contract" has examined the goods, or refused to do so after demand for inspection by the seller. *See* Official Comment to § 55-2-316(3)(b). In this case, there is no evidence Plaintiff was asked to inspect the conduit before buying it, or even had an opportunity to inspect it before placing the order. *See Seattle Flight Service, Inc. v. City of Auburn*, 604 P.2d 975, 978 (Wash. App. 1979) (citing Anderson treatise on Uniform Commercial Code for proposition that any opportunity for inspection that might eliminate implied warranties must be prior to the sale); J. White & R. Summers, *Uniform Commercial Code,* § 12-6(b) (seller must make demand for inspection before contract is formed; buyer's refusal to inspect after contract formation will not affect warranties). Plaintiff's lack of inspection of the conduit, therefore, does not eliminate any implied warranties that might otherwise be present in this case.

Furthermore, with respect to the express warranty issue, there is no evidence Plaintiff was aware of the defects in the conduit before Plaintiff began to install it. Defendant makes much of the fact that Plaintiff's employees testified, in their depositions, that the defects were readily apparent,

once they looked inside the conduit segments after the problems with the cable were discovered. This testimony, however, says nothing more than the defects were obvious once someone was alerted to the fact there might be a problem. There was no testimony that it was unreasonable for Plaintiff to install the conduit without first inspecting the interior of each segment. In fact, the only evidence has been to the contrary, that the usual practice in the industry is not to inspect conduit before it is installed. Chuck Martin deposition, pp. 125-26. Therefore, there is no factual issue in this case as to whether Plaintiff unreasonably failed to inspect the conduit, or used the conduit knowing it failed to satisfy the terms of the express warranty created by Defendant.

In sum, Defendant will be precluded from arguing that any implied or express warranties that might otherwise exist in this case were voided by Plaintiff's failure to inspect the conduit before it was used.[1]

### Plaintiff's Standing Under the Unfair Practices Act

Defendant maintains Plaintiff, as a corporation purchasing the conduit for business use, cannot bring an action under New Mexico's Unfair Practices Act, NMSA 1978, Section 57-12-1 *et seq.* (UPA). The Court disagrees. In *Jones v. General Motors Corp.*, 953 P.2d 1104, 1108 (N.M. App. 1998), the court decided the UPA applies even if a good is purchased and used primarily for business purposes. In doing so, the appellate court pointed out the broad definition of "persons" protected by the UPA, including corporations, trusts, partnerships, associations, companies, firms, and joint ventures. *Id.* It defies logic to argue the legislature intended to exclude commercial transactions from the scope of the UPA, when it specifically included commercial entities within the protection of the Act as "persons" entitled to invoke its provisions. *See Fiberglass Component Production, Inc.*

---

[1]The evidence cited by Defendant at most raises a factual question concerning how obvious the defects in the conduit were. If the defects were so obvious that a worker handling the conduit sections should have become immediately aware of them, Defendant might have an argument that installing the conduit was unreasonable and Defendant should not be liable for consequential damages. See NMSA 1978, § 55-2-715, comment 5. The Court's ruling on the inspection issue should not be interpreted as precluding such an argument.

*v. Reichhold Chemicals, Inc.*, 983 F.Supp. 948, 961 (D.Colo. 1997) (holding Colorado version of UPA applicable to corporation); *Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*, 573 N.E.2d 1370, 1376 (Ill. App. 1991) (Illinois Consumer Fraud Act, containing definition of "person" similar in breadth to UPA's, applies to businesses as well as consumers); *American Petrofina, Inc. v. PPG Industries, Inc.*, 679 S.W.2d 740, 747 (Tex. App. 1984) (applying Texas Deceptive Trade Practices Act to commercial transaction; stating corporation qualifies as "consumer" under the statute if it purchases, leases, or seeks to acquire goods or services). New Mexico appellate courts, in fact, have impliedly recognized the UPA's applicability to commercial transactions. *See Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308 (N.M. 1991) (applying UPA to breach-of-contract situation between buyer and seller of cattle; holding UPA jury instruction given in the case insufficient); *Diversey Corp. v. Chem-Source Corp.*, 965 P.2d 332 (N.M. App. 1998) (applying UPA to purely commercial dispute between corporations). The Court holds the UPA is applicable to commercial transactions involving corporations or other business entities.

**Motion to Strike Strenk Affidavits**

Plaintiff has moved to strike James Strenk's affidavit and supplemental affidavit, claiming the affidavits contain statements of fact not based on personal knowledge. Strenk's affidavit discusses Defendant's general practice of including a price sheet, containing disclaimers and limitations of liability, in every sale to its distributors. Strenk also averred that such a price sheet was sent to the distributor in this case, and became a part of the transaction between the distributor and Defendant. Plaintiff complains that Strenk failed to explain how he knows the distributor actually received such a price sheet, or when such a sheet was sent to the distributor, because he was not personally involved in the transaction. Plaintiff also complains that Strenk failed to produce any supporting documentation confirming his allegation that the price sheet was sent to the distributor.

In the Court's view, striking Strenk's affidavits in their entirety is not appropriate, since the affidavits do contain statements based on personal knowledge. The Court agrees, however, that certain statements made by Strenk do not appear to be competent evidence. For example, Strenk

averred that Border States, the distributor, had possession of a price sheet containing the terms and conditions of sale, including disclaimers of warranties and limitations of liability. This statement does not appear to be based on personal knowledge, because Strenk did not claim to have seen the price sheet in Border's possession, or to have mailed it to Border, or to have seen a record of such mailing. The most Strenk can testify to is that as a general practice, transactions between Defendant and its distributors are based on such price sheets, and he therefore believes Border must have had such a price sheet in its possession. Similarly, Strenk's assertion that commercial supply contracts such as the one between Defendant and Border include limited warranties and remedies cannot be interpreted as a factual assertion that the particular transaction in question in this case included such disclaimers and limitations. Instead, it must be construed, like the rest of the affidavit, as an assertion concerning Defendant's general business practices. Based on the foregoing discussion, the Court will not strike Strenk's affidavits. However, in addressing the various motions for summary judgment filed in this case, the Court will accord only so much evidentiary weight to Strenk's assertions as each statement may deserve. *See, e.g.*, *Fiberglass Component,* 983 F.Supp. at 958 (general assertion that it was routine practice to include a copy of terms and conditions with each sale to distributor, given failure to produce actual copy of such document received by distributor, raised question of fact as to whether distributor received such document).

**Plaintiff's Alleged Failure to Properly Revoke Acceptance**

Defendant has filed a motion claiming that Plaintiff is barred from any remedy in this case, as a matter of law, for two reasons. First, Plaintiff's remedies are limited to those provided by the Uniform Commercial Code (U.C.C.); second, Plaintiff failed to properly revoke acceptance of the conduit and therefore may not recover under the U.C.C. The Court will address the exclusion of remedies other than U.C.C. remedies below, in the section addressing the economic-loss doctrine. This portion of the opinion addresses Defendant's argument that Plaintiff, as a matter of law, failed

to properly revoke acceptance of the conduit.[2]  This contention is completely without merit and borders on the frivolous.  It is based on Defendant's argument that the defects in the conduit were obvious and that Plaintiff had an obligation to inspect each segment of conduit before installing it. As discussed above, there is a factual dispute concerning whether the defects were obvious or not, to a person installing a section of conduit.  There is also apparently undisputed testimony that it is not standard practice in the industry to inspect each section of conduit, or even any of the conduit, before it is installed.[3]  Finally, it also appears to be undisputed that Plaintiff notified both the distributor and, through the distributor, Defendant, within one day of discovering the alleged defects in the conduit. Under these circumstances, Defendant cannot argue as a matter of law that Plaintiff failed to properly revoke acceptance of the conduit, or accepted the conduit with knowledge of its nonconformity, or unreasonably used the conduit without first inspecting it, or failed to provide adequate notice of the claimed defects in the conduit.  *See* NMSA 1978, § § 55-2-607, 608 (statutory provisions concerning rejection of nonconforming goods and revocation of acceptance within a reasonable time of discovery

---

[2]No party has addressed the question of whether a remote purchaser has revocation-of-acceptance rights against a manufacturer under New Mexico's version of the U.C.C., and the Court therefore will not address the issue.  *See, e.g.,* Donald Clifford, *Express Warranty Liability of Remote Sellers: One Purchase, Two Relationships*, 75 Wash.U.L.Q. 413, 448 (1997) (noting majority view denying revocation against remote sellers).

[3]Defendant relies on the Subcontract Specifications governing Plaintiff's performance of its subcontract, which required Plaintiff to "ream all raceways, remove all burrs, and clean raceway interior before introducing conductors or pull wires."  Defendant contends these specifications created a duty on Plaintiff's part to inspect each segment of conduit before installing it.  As Plaintiff points out, however, this argument fails for at least two reasons.  First, the Subcontract Specifications do not concern Defendant at all and have no effect on Plaintiff's duties under the U.C.C. to inspect the conduit before installing it.  Second, there is apparently uncontradicted evidence that the section of the Specifications relied on by Defendant applied only if Plaintiff cut a section of the conduit; after cutting the conduit, Plaintiff was required to ensure the raceway remained clear.  Klundt Affidavit, p. 154.  Therefore, the Specifications did not require Plaintiff to inspect the conduit prior to installation.

of grounds for revocation).  Defendant's attempt to bar Plaintiff from any U.C.C. remedy will, therefore, be denied.[4]

### Use of Total-Cost Method of Calculating Damages

Defendant maintains Plaintiff's expert used a disfavored method of calculating Plaintiff's damages, the total-cost method, and asks the Court to prevent the use of that method at trial.  The Court finds this motion more of an argument over semantics than a valid dispute over a substantial issue.

The classic total-cost method, which is disfavored by courts, simply compares the contractor's bid amount to the total costs incurred by the contractor.  The difference between the two is assumed to be the amount of damages suffered by the contractor.  That is, there is an assumption that the contractor's bid was accurate, that the job would have been completed on time and within budget except for the defendant's actions, and that all increased costs are therefore attributable to the defendant as damages.  The method is disfavored because it does not take into account matters such as the fact the original bid might have been too low, or there may be reasons other than the defendant's actions for the increased costs.  *See Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861-62 (Fed. Cir. 1991).  In other words, the total-cost method in its pure form does not require specific proof that the defendant's actions caused the damages suffered by the plaintiff.      Plaintiff

---

[4]The Court notes Plaintiff's argument that breach-of-warranty damages are still available even if no proper revocation of acceptance or rejection has occurred.  (Plaintiff's brief, Motion Seven, p. 14).  While Plaintiff's position appears to be correct as a matter of law, the Court understands Defendant's argument to be, in essence, that Plaintiff did not inspect the conduit when it should have done so; installed the conduit unreasonably without discovering the defects; thereby failed to provide adequate notice to Defendant of any breach of warranty; and is therefore barred from recovering damages under the U.C.C.  (Defendant's reply brief, Motion Seven, pp. 4-5).  In other words, Defendant appears to be restating in another form the argument addressed above, that Plaintiff may not recover consequential damages under the U.C.C. because Plaintiff installed obviously defective conduit without first inspecting it.   Defendant does not appear to be arguing that the claimed failure to revoke acceptance, standing alone, bars any remedy under the U.C.C.  For that reason, the Court has not addressed such an argument.  Instead, the Court has addressed only the failure-to-inspect, revocation-of-acceptance, and reasonable-notice issues raised by Defendant.

argues the expert did not use the above-described total-cost method, although he did use that phrase to describe his analysis of the damages caused when Plaintiff was required to remove the portion of the conduit and cable that had already been installed, re-install new conduit and cable, and remain on schedule or as close as possible. The expert's report in this case is highly specific in attempting to assess both Plaintiff's ability to finish the job on time and within the bid's budget, and the increased costs caused by the allegedly defective conduit. The expert pointed out that at the time the defective conduit was discovered, Plaintiff's work was on schedule and within budget. This raises at least a factual issue concerning the accuracy of the original bid and whether Plaintiff would have been able to complete the job within the projected budget. Also, the expert examined accounting records established by Plaintiff, which attempted to allocate labor and other expenses to the removal of the defective conduit, the replacement of that conduit, the problems caused by the fact the cable was also defective, and the ordinary continuation of work that would have occurred if the difficulties with the conduit and the cable had not occurred. In other words, Plaintiff attempted to keep track of the additional expenses caused by the allegedly defective conduit and the defective cable, and thereby attempted to provide detailed causation evidence for the expert's review. This is not the total-cost method disfavored by courts. Although Plaintiff's efforts, the accuracy of the original bid, and the expert's report are certainly open to factual challenge, the Court will not preclude Plaintiff from presenting this evidence at trial, whether the expert's method is called a "total cost method" or not. Defendant's motion on this point will be denied.

**Economic Loss Doctrine**

Plaintiff has alleged a number of tort claims against Defendant, in addition to the breach-of-warranty and UPA causes of action. In several of its briefs, Defendant has maintained these tort claims are barred under New Mexico law, due to the economic-loss doctrine. According to Defendant, Plaintiff is limited to whatever remedies it may have under the U.C.C. because this case involves a commercial transaction between parties of relatively equal bargaining power. In response to this argument, Plaintiff has put forth two major contentions. First, Plaintiff argues the economic-

loss doctrine is intended only to prevent parties from circumventing contractual limitations on liability. Since, according to Plaintiff, there were no such limitations in this case, there is no reason to apply the economic-loss doctrine. Second, Plaintiff points out an exception to the economic-loss rule, which applies when a defective product damages property other than itself. Since the allegedly defective conduit damaged the cable that had been pulled through it, the economic-loss rule has no applicability to this case, according to Plaintiff.[5]

The Court confesses to having some difficulty understanding Plaintiff's first argument. It appears as though Plaintiff is contending that when no contractual limitations exist, and thus more damages are available to a plaintiff *via* a contract claim, there is less reason to apply the economic-loss doctrine. This argument appears to be contrary to the purpose of the doctrine, which is to ensure that commercial disputes are resolved by resort to principles of commercial law rather than tort law. *See Utah International, Inc. v. Caterpillar Tractor Co.*, 775 P.2d 741, 744 (N.M.App. 1989) (adopting economic-loss doctrine in New Mexico, and holding that damages for economic losses in commercial settings, where the injury causing the losses is to the product itself, may only be recovered in contract actions); *see also Dakota Gasification Co. v. Pascoe Bldg. Systems*, 91 F.3d 1094, 1097 (8th Cir. 1996) (economic loss doctrine is based on the understanding that contract law, and the law of warranty in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena).

Plaintiff's second argument is not as easily answered, but the Court will reject it as well. The economic-loss doctrine is a rule established to address a buyer's commercial expectations rather than the loss-distribution policy underlying tort recovery. *Chicago Heights Venture v. Dynamit Nobel of*

---

[5]The Court notes Plaintiff has not raised an argument, accepted by some courts, that fraud-in-the-inducement claims, unlike other tort claims, are not barred by the economic-loss doctrine. *See Budgetel Inns, Inc. v. Micros Systems, Inc.*, 8 F.Supp.2d 1137, 1144-49 (E.D.Wis. 1998) (discussing this exception and cases that have applied it). The Court therefore need not determine whether Plaintiff has raised a fraud-in-the-inducement claim, and how New Mexico courts would apply the economic-loss doctrine to such a claim.

*America*, 782 F.2d 723, 728 (7ᵗʰ Cir. 1986).  When a product causes damage only in the commercial realm which is the subject of the contract, the application of tort law to reallocate the risk based on public policy is not required.  *Id.; see also East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 872 (1986).  In order to accomplish this result, courts (including New Mexico courts) have created the following dividing line: where a product is defective, and the defect causes injury to a person or to property other than the product itself, an action in tort may be maintained to recover for the damages caused by the defect to the person or other property.  For example, if a defective engine explodes, injuring the owner of the vehicle who was working on the engine and starting a fire that destroys the owner's garage, the plaintiff may maintain a tort action to obtain redress for his personal injury and the damage to the garage.  Where the defect causes injury to the product itself, however, and thereby leads to purely economic losses, a tort action may not be used to recover those economic losses.  *See Utah International.*  In the case of the defective engine, for example, the plaintiff would not be able to recover in tort for damages such as the cost of replacing the defective engine, or consequential damages arising out of the loss of use of the engine.

When defining "economic losses," courts have included items such as the cost of repairing or replacing the defective product, lost profits, and other consequential economic loss.  D'Angelo, Christopher, *The Economic Loss Doctrine: Saving Contract Warranty Law from Drowning in a Sea of Torts*, 26 U. Tol. L. Rev. 591 (1995).  In this case, then, all of the damages claimed by Plaintiff would be considered economic losses.  The costs of removing the defective conduit and cable, the increased costs incurred while Plaintiff struggled to stay on schedule and recover the time lost, and the slow-down in the work resulting from the fact that Plaintiff's employees no longer had unfettered access to the work areas, are all damages purely economic in nature, and similar to lost profits.  Plaintiff has made no claim for reimbursement for personal injury or for damage to other property.  Under the normal operation of the economic-loss rule, therefore, Plaintiff's tort claims would be disallowed and Plaintiff would be limited to its breach-of-warranty claims.

Plaintiff attempts to avoid this result by arguing the defects in the conduit caused damage to other property, to wit the cable that was cut when it was pulled through the conduit. Plaintiff maintains that since there was damage to other property, no matter how slight, the entire case is removed from the sphere of the economic-loss rule and Plaintiff may pursue its tort causes of action. This is not the Court's view of how the economic-loss doctrine should be applied. If a case involves both economic losses resulting from a defective product and injury to other property, a tort action should lie only to obtain recovery of the damages caused by the injury to the other property, while a contract or warranty claim will be necessary to recover for the economic losses arising out of the fact that the product was defective. In other words, the presence of injury to a person or to other property is not a talisman that allows tort recovery for all losses sustained in the transaction. Instead, the losses must be traced to their source, and if the source is primarily the defective product rather than the injury to the other property, the plaintiff's remedy will lie in commercial law rather than tort law. *Cf. Saratoga Fishing Co. v. J.M. Martinac & Co.*, 117 S.Ct. 1783, 1785-86 (1997) (applying "other product" exception to economic-loss rule to determine what damages a tort plaintiff could recover, rather than whether plaintiff could bring tort action to recover all of its damages); *East River*, 476 U.S. at 871 (1986) (manufacturer has no duty under a tort theory to prevent a product from injuring itself).[6]

Examination of the facts of this case is instructive. A portion of the allegedly defective conduit was installed, and then the alleged defects in the conduit were discovered. It was also

_____

[6]*Saratoga* and *East River* support the Court's position, logically, as follows: under *East River* there is no tort duty on the part of a manufacturer to prevent injury to the product itself. Therefore, there can be no tort duty to prevent direct or consequential economic losses arising out of the injury to the product itself, even if there is also injury to other property. *Saratoga* illustrates this by demonstrating that the inquiry in "injury to other product" cases is what damages may be recovered *via* a tort action as opposed to a commercial-law action. The *Saratoga* court did not attempt to determine whether a tort cause of action was available to the plaintiff to obtain recovery of all of its damages. *Cf. Utah International*, 775 P.2d at 744-45 (describing economic-loss rule as prohibiting recovery in tort for economic losses sustained as a result of injury of a product to itself).

discovered that the cable pulled through the conduit had been damaged. Due to the defects in the conduit, Plaintiff was required (by the general contractor and Intel) to remove all of the conduit that had been installed, replace it, and catch up to its previous schedule despite more difficult working conditions. To accomplish all of this Plaintiff had to hire many more employees and have its employees work many more overtime hours. These are classic economic losses arising out of the fact the conduit manufactured by Defendant was defective. The damage to the cable was not the cause of the economic losses – instead, the alleged defects in the conduit necessitated its removal and replacement. The only damages Plaintiff might be able to recover in tort, under the "damage to other property" theory, would be the injury to the cable itself. However, Plaintiff did not request such damages in its pleadings. The Court will therefore grant summary judgment on Plaintiff's tort claims.

### Warranties, Disclaimer, and Limitation of Liability

Plaintiff has raised claims based on implied warranties as well as express warranties. Defendant has admitted that an express warranty was created by its advertisements and other materials concerning Kwik-Fit conduit, although the exact terms of that express warranty appear to be disputed. Defendant does, however, contend its liability under the express warranty was limited. Defendant also contends no implied warranties were created by Plaintiff's purchase of the conduit. Both of these contentions are based on one crucial factual assertion and one crucial legal assertion. The factual assertion is Defendant's claim that Border, the distributor, had in its possession a price sheet including provisions called the terms and conditions of sale, which applied to the sale of any product covered by the price sheet. Included in these terms and conditions was a disclaimer of any implied warranty, in particular the warranties of merchantability and fitness for a particular purpose. Also included was a limitation of liability, limiting the purchaser's remedy to repair or replacement of the product, or return of the purchase price, should the product prove to be defective. Defendant's legal assertion is that the disclaimer and limitation of liability both applied to Plaintiff, as a remote purchaser of conduit through the distributor, even though it is undisputed that neither the disclaimer

nor the limitation of liability was communicated to Plaintiff prior to or at the time Plaintiff purchased the Kwik-Fit conduit.

As the Court pointed out above, there is a genuine issue of fact as to whether Border did in fact have in its possession a document containing the terms and conditions of sale. Both Defendant's sales agent and a representative of Border, in their depositions, testified they had no knowledge of any warranties, limitations on liability, or disclaimers. Furthermore, the Strenk affidavit, which is Defendant's only evidence supporting this factual assertion, states at most that it is Defendant's general practice to communicate the terms and conditions of sale to its distributors. Defendant has not yet produced a document that had been in Border's possession at the time of the transaction, containing the terms and conditions. Due to this issue of fact alone, those of Defendant's motions for summary judgment that are dependent on the disclaimer or limitation of liability should be denied. The remaining question is whether Plaintiff's opposing motions for summary judgment, arguing the disclaimer and limitation are ineffective as to its purchase of the conduit, should be granted. In answering this question the Court will assume the distributor did have a copy of the terms and conditions of sale in its possession, and that the transaction between Defendant and the distributor was governed by those terms and conditions.

The relevant facts of this case are stated simply, as is the precise legal issue raised by those facts. Plaintiff, as a remote purchaser from a distributor rather than directly from the manufacturer (Defendant), had no knowledge of the disclaimer and limitation of liability that governed the transaction between Defendant and the distributor. In addition, the transaction between Plaintiff and the distributor involved no disclaimers or liability limitations. Under these circumstances, is Plaintiff still bound by the disclaimer and limitation included in the Defendant-distributor transaction?[7]

---

[7]The Court notes one other possible argument that has not been raised by the parties, and which the Court should not be understood to be addressing, either expressly or impliedly. A number of jurisdictions still require privity between a seller and a buyer where the buyer's warranty claims involve only economic losses suffered by a commercial buyer. Although New Mexico has abolished the privity requirement in a personal injury case, *Perfetti v. McGhan Medical*, 662 P.2d 646 (Ct. App.

Although the legal question may appear uncomplicated, courts addressing it have been badly split as to how it should be answered, both as to the result that should obtain and as to the reasoning supporting that result; New Mexico has not yet addressed the issue. What appears to be a minority of courts has held that remote purchasers are bound by disclaimers and limitations contained in contracts between the manufacturer and the distributor, even though the purchaser had no knowledge of the exclusions. One rationale for this result is as follows: (a) the only source of the purchaser's warranties is the purchaser's status as a third-party beneficiary of the contract between the manufacturer and the distributor; (b) a third-party beneficiary can have no greater rights than the parties to the contract; (c) therefore, any disclaimers or limitations contained in the manufacturer-dealer transaction automatically apply to the purchaser. *See, e.g.*, *Ohio Savings Bank v. H.L. Vokes Co.*, 560 N.E.2d 1328, 1332 (Ohio App. 1989); *R & L Grain Co. v. Chicago Eastern Corp.*, 531 F.Supp. 201, 209 (N.D.Ill. 1981) (under Illinois law, remote purchaser could sue under warranty for economic losses only as a third-party beneficiary, and all disclaimers in manufacturer-distributor contract therefore applied to purchaser). Another reason given by at least one court is that U.C.C. Sections 2-316 and 2-318 specifically allow sellers to exclude implied warranties as against certain remote users of the product. *Transport Corp. of America v. International Business Machines Corp., Inc.*, 30 F.3d 953, 959 (8th Cir. 1994) (applying Minnesota version of section 2-318). Finally, one court has simply held that a seller under the U.C.C. has the right to disclaim warranties, and a remote purchaser has no power to prevent the manufacturer, as a seller, from doing so. *Western Equip. Co. v. Sheridan Iron Works, Inc.*, 605 P.2d 806, 810 (Wyo. 1980).

---

1983), it does not appear New Mexico has addressed the issue where only economic losses and a commercial buyer are involved. *See* Dean W. Russell, *Enforcing Manufacturers' Warranty Exclusions Against Non-Privity Commercial Purchasers: The Need for Uniform Guidelines*, 20 Ga. L. Rev. 461, 496, footnotes 16 and 20 (1986) (listing states that have addressed the question and either retained or abolished the privity requirement in such cases; New Mexico not included in list); *see also* Ora F. Harris and Alphonse M. Squillante, 2 *Warranty Law In Tort and Contract Actions,* App. A (1989) (stating privity not required in New Mexico; citing consumer-buyer cases).

A larger, although still small, number of courts have refused to apply a manufacturer's disclaimers and limitations to a remote purchaser unless those exclusions were communicated to the purchaser. Most of these courts hold, with little or no discussion, that a disclaimer must be communicated to the remote purchaser to be effective. *See, e.g.*, *Infocomp, Inc. v. Electra Products, Inc.*, 109 F.3d 902, 908 (3d Cir. 1997) (applying Pennsylvania law); *Dixie Roofing Co. v. Allen Parish Sch. Bd.*, 690 So.2d 49, 53 (La. App. 1996); *Adams v. American Cyanamid Co.*, 498 N.W.2d 577, 587 (Neb. App. 1992); *Spagnol Enters., Inc. v. Digital Equip. Corp.*, 568 A.2d 948, 952 (Pa. Super. 1989); *Groppel Co., Inc. v. United States Gypsum Co.*, 616 S.W.2d 49, 60-61 (Mo. App. 1981). Both the Tenth Circuit and the Fifth Circuit have relied on the fact that under the U.C.C., a disclaimer of warranties must be conspicuous. Those courts have held that a disclaimer cannot be conspicuous to the remote purchaser unless that purchaser had knowledge of it. *Patty Precision Prods. Co. v. Brown & Sharpe Mfg. Co.*, 846 F.2d 1247, 1253-54 (10th Cir. 1988) (applying Oklahoma law and U.C.C. provision 2-316, requiring disclaimer to be in writing and conspicuous); *Clark v. DeLaval Separator Corp.*, 639 F.2d 1320, 1323-24 (5th Cir. 1981) (under Texas law, manufacturer must communicate its own disclaimer to remote purchaser, to satisfy conspicuousness requirement of U.C.C.).

In the face of the above split in authority, the lack of any clear agreement among commentators, and the lack of controlling New Mexico law on the question,[8] the Court must attempt to predict how New Mexico courts would rule. The Court will address the express warranty/limitation of liability issue separately from the implied warranties/disclaimer issue, as each involves a somewhat different analysis.

---

[8]The Court is aware that while not addressing the exact issue, the New Mexico Supreme Court has held a disclaimer of implied warranties is not effective as a matter of law where the buyer was not "aware of the disclaimer when he signed the purchase agreement." *C.E. Alexander & Sons, Inc. v. DEC Int'l, Inc.,* 811 P.2d 899,905 (N.M. 1991). The Court believes the present holding to be consistent with this case.

**Express warranties and Limitations on Liability:** Defendant made express warranties concerning Kwik-Fit, in the literature and advertising material provided to potential buyers such as Plaintiff. Defendant's position in this case is that it could use the express warranties to attract Plaintiff as a customer, and then limit its liability for breach of those express warranties without telling Plaintiff such limitations existed. Merely to state the proposition emphasizes the inequity of applying it to these facts. In addition, however, the argument is flawed as a matter of logic. There can be no argument here, as there was in *Ohio Savings* and *R & L Grain Co.*, that Plaintiff's warranty only exists due to Plaintiff's status as a third-party beneficiary of the contract between Defendant and the distributor. Defendant's express warranties were communicated directly to Plaintiff, and were obviously intended to induce Defendant to rely on them. Given the direct rather than derivative nature of the warranties, Defendant should have also directly communicated to Plaintiff any limitations placed on the warranties. *Virginia Transformer Corp. v. P.D. George Co.*, 932 F.Supp. 156, 161 (W.D.Va. 1996) ("Warranties created through specific and express representations between parties outside the chain of distribution must be disclaimed between those parties themselves, not through an intermediate distributor."). Defendant could have done so, for example, by including the liability limitations in the literature distributed to potential buyers.

The Court notes, furthermore, that the Section 2-318 argument relied on in *Transport Corp.* is inapposite. Section 2-318 concerns horizontal privity, not vertical privity. *Ed Black's Chevrolet Center, Inc. v. Stuart Truck Equipment, Inc.*, 733 P.2d 870, 871-72 (N.M. App. 1987). That is, Section 2-318 does not apply to a transaction, such as this one, involving a buyer within the distributive chain that began with the manufacturer. *Id.* Instead, in New Mexico it applies to situations in which a family member or guest of the buyer uses the product. *Id.* Thus, although it is true that the commentary to Section 2-318 allows a manufacturer's limitation of liability to be effective against "beneficiaries" of the manufacturer's express warranty, the "beneficiaries" referred to are those in horizontal privity with a purchaser of the product, not a purchaser (such as Plaintiff) in vertical privity with the manufacturer. As to the vertical-privity-purchaser question, the drafters

of the U.C.C. left the problem unresolved, to be answered by the courts. § 55-2-318, commentary 3; Russell, *supra*, 20 Ga. L. Rev. at 478.

Where a manufacturer has created a direct relationship with a remote purchaser, through an express warranty communicated to that purchaser, then it is only fair that any restrictions on the warranty also be communicated directly to the purchaser. Since that did not occur in this case, the Court will find Defendant's limitation of liability ineffective with respect to Plaintiff's breach-of-express-warranty claim.

**Implied Warranties and Disclaimers:** Defendant attempted to disclaim any implied warranties that might be created by Plaintiff's purchase of the conduit, without informing Plaintiff of the disclaimer. Whether this should be allowed or not appears to depend in part on whether the sale of the conduit should be considered to create a relationship between Plaintiff and Defendant, or to be merely a by-product of the original transaction between Defendant and the distributor. If a direct relationship of a sort was created, as in the express warranty situation, the argument for requiring communication of disclaimers to the remote purchaser is stronger. On the other hand, if Plaintiff's implied-warranty protections are merely derivative of the distributor's rights versus Defendant, there appears to be no reason for Plaintiff to be aware of the disclaimer because such awareness could not affect Plaintiff's potential rights with respect to Defendant.

In addressing this issue most courts have focused on fairness to the parties. For example, courts holding disclaimers ineffective against remote purchasers unless there is communication of the disclaimers to those purchasers have gone out of their way to point out methods manufacturers could have used to ensure the purchaser's awareness of the disclaimers. *See Clark* (disclaimer could be included in materials given to purchaser, or manufacturer could be named in contract documents between distributor and purchaser, as disclaiming seller); *Groppel* (manufacturer may disclaim through prominent package markings). The Tenth Circuit, in *Patty Precision*, emphasized the fact the manufacturer was fully aware who the ultimate purchaser of the product was to be, and helped install the product, making the transaction more in the nature of a direct sale to the purchaser.

Given this focus the facts of this case are important. As in *Patty Precision*, Defendant knew Plaintiff was to be the ultimate purchaser of the conduit, both because Defendant's sales agent knew Plaintiff was the buyer and because Plaintiff was identified as the customer on the purchase order submitted to Defendant by the distributor. This was not a situation where a manufacturer sent its goods into the stream of commerce with no idea of the ultimate destination. In addition, the distributor in this case acted more like a sales agent for Defendant, rather than a true middle-man. The distributor took Plaintiff's order, communicated it to Defendant, and had the conduit shipped directly to Plaintiff's job site at Intel. The distributor did not order the product, stock it on its shelves, and then pass it on to a buyer unknown to Defendant. Under these circumstances, the Court concludes Defendant had ample opportunity to disclose its disclaimers directly to the real party in interest in the transaction, Plaintiff, either in its literature or through the distributor. Furthermore, fairness dictates that Defendant be required to do so if the disclaimers are to have any effect on the warranties implied by law in the sale of the conduit to Plaintiff.

On these facts the Court does not find the contrary authority cited above persuasive. As the Court has already explained, the *Transport Corp.* approach, relying on Section 2-318, is not convincing because Section 2-318 is inapplicable to vertical-privity situations such as this one. Also, the third-party-beneficiary rationale of *R & L Grain* and *Ohio Savings* is unpersuasive because it assumes Plaintiff's implied-warranty rights are contractual in nature, and dependent on the original sale between Defendant and the distributor. To the contrary, the Court views implied warranties as creatures of statute, imposed for public-policy reasons. Public policy as reflected in the U.C.C. has dictated that implied warranties be present in every sale of goods, unless those warranties are disclaimed. Furthermore, under the circumstances of this case, it was entirely reasonable to expect Defendant to be able to communicate its disclaimer to the party the legislature most intended the implied warranties to benefit -- Plaintiff, the ultimate purchaser and user of the product. For the above reasons and under the specific facts of this case, the Court predicts New Mexico would hold Defendant's disclaimer ineffective against Plaintiff, as a remote purchaser without knowledge of the disclaimer.

**Foreseeability of Damages**

In Defendant's motion seeking exclusion of Plaintiff's consequential damages, Defendant argued Plaintiff's damages were not reasonably foreseeable. There is certainly a factual issue concerning foreseeability of damages in this case. Even if Plaintiff should be allowed to recover costs of removing and replacing the conduit, it is not clear whether Defendant should have been able to foresee all of the barriers that would face Plaintiff in doing so, as well as Intel's insistence that Plaintiff remain as close to on-schedule as possible. On the other hand, as noted above, Defendant knew Plaintiff was buying the conduit and knew Plaintiff was working at Intel. In addition, Defendant's sales representative testified he knew Intel was the most demanding customer in New Mexico; Intel was considered "head and shoulders above" any other. The Court will find this issue involves a classic question of fact to be resolved at trial, and will deny Defendant's motion to the extent it relies on this argument.

**Conclusion**

Based on the foregoing, the Court will grant Defendant's motions directed at eliminating Plaintiff's tort claims from this case. The Court will deny all of Defendant's other motions, as well as Plaintiff's motion to strike Strenk's affidavit. Finally, the Court will grant Plaintiff's counter-motions for summary judgment to the extent they are consistent with this opinion. The Court has attempted to address all of the parties' contentions, but given the number of different motions filed in this case it is possible the opinion omits consideration of some issues. If that is the case, it is incumbent on the parties to inform the Court so the omission may be addressed.

An Order in accordance with this Memorandum Opinion will be issued.

Dated this 12th day of January, 1999.

**BRUCE D. BLACK**
United States District Judge